OPINION ON MOTION FOR REHEARING[1]
SOUTHWICK, P.J.,
for the Court.
¶ 1. H. Aex Trotter filed a complaint in the Hinds County Chancery Court against adjoining landowners to quiet and remove clouds on title to real property. A counterclaim that their own title be quieted was filed by the defendants, Francis N. Burgess, Sr., Francis N. Burgess, Jr. and Lula Burgess. The chancellor ruled for Trotter on most of the disputed property, and also determined the location of a 140-yard strip of land. The Burgesses appeal. We find that the chancellor’s decision and our initial opinion left undetermined the location of the 140-yard strip. We further conclude that there was substantial proof regarding possible errors in certain deeds in the chain of title. Whether there were errors and, if so, their effect on the location of the 140-yard strip or on the other land was never addressed by the chancellor. Accordingly, we reverse and remand for further proceedings.
*764 FACTS
¶ 2. For clarity, a plat is attached to this opinion (exhibit 3 at trial, with a driveway from exhibit 6A added). The current suit has involved parcels 1, 2 and 3 on the plat. In 1997, Francis Burgess, Sr. decided to sell certain property, retaining only his fenced homestead in the northwest corner of the property. After receiving an offer, Burgess had a survey prepared. Burgess would later testify that this was the first time anyone became aware that the legal description of the western edge of certain property that his family had owned since 1927 was about 100 feet east of the old Bolton-Brownsville road bed and not at the road bed itself. Trotter disputed this. He testified that his family always knew that the boundary was east of the old road.
¶ 3. Burgess attempted to purchase a quitclaim deed on the disputed property from Trotter, but Trotter declined. Burgess then filed an adverse possession suit. Trotter filed no counter-claim. On September 11, 1998, the Hinds County Chancery Court dismissed the claim due to the Burgesses’s failure to prove exclusive use. Instead, the chancellor found that both parties had been using the property. Thereafter, on May 12, 1999, Trotter filed the present complaint against the Burgess-es to confirm title and remove clouds. The Trotters claimed all of the NW 1/4 of SW 1/4 of the relevant section, arguing that the Burgesses owned nothing within that 40-acre tract. The defendants filed a counter-claim to quiet their own title to about six acres in the same quarter-quarter section.
¶4. There are two title issues to be resolved in the suit. One is the location of an ambiguously described tract of land first conveyed in 1941 after the public road in this area was shifted to the west. The other is ownership of land adjacent to the old road, an issue that arises because of one party’s evidence, disputed by the other, that the historical descriptions of this property were based on a mistake about the location of the public road in relation to the dividing line between the NW 14 of the SW 14 and the NE 14 of the SW % On the exhibit to the opinion, parcel 1 is the surveyed location of the easternmost 2.5 acres in the NW 14 of the SW 14. There was contested evidence that the community had operated with the understanding that the east line of the quarter-quarter section was farther west than the survey found. This view promoted the thesis that the 2.5 acre tract was conveyed to the Burgesses in 1927 to allow the property that they owned to the east to connect with the old road. The modern surveys insist that obtaining the eastern 2.5 acres only got the Burgesses closer to the road but did not reach it. The 1927 deed to the 2.5 acre tract also conveyed the 2.5 acres immediately south, such that a narrow 5-acre strip was conveyed parallel to the road that ran generally north and south throughout the W 14 of the SW 14 of the section. The Burgesses owned everything immediately to the east of that 5-acre strip.
¶ 5. Trotter’s failure in his complaint to acknowledge the 1927 deed to the Bur-gesses of the easternmost 2.5 acres in the 40 acres that Trotter claims has been rectified. The Burgess title to that tract (parcel 1 on the plat) is no longer contested. What remains is determining title to about 4 acres of land. A decision must be reached without the element of meaningful possession by either party. The former suit in which the Burgesses were found not to have possessed adversely any of the property is not res judicata at least as to the record title issues. Whether res judicata applies to any contested matter in the present litigation will be discussed below.
*765 ¶ 6. According to the deeds introduced into evidence, over ninety years ago the Trotter family became the record title holder of the NW % of the SW % of the section. The Burgesses became the record title holders of the 2.5 acres on the east side in 1927, and also own contiguous property to the east and south. Into this ownership was injected in about 1939 the moving of the Bolton Brownsville Road west of its former location in the NW % of the SW %. The old road ran essentially due north and south; the new road has more curvature. As indicated above, it is unclear whether the Burgesses, by owning the easternmost 2.5 acres, were thought to own everything east of the old road and the Trotters everything that was west. The understood state of ownership would help explain the intent of a 1941 deed executed by plaintiff Trotter’s grandparents to the father of defendant Francis Burgess, Sr. The deed conveyed this land:
A narrow strip of land, approximately 140 yards long, lying between the old and new Bolton and Brownsville Highway, and adjoining the land now owned by said A.L. Burgess, and being in the west half of the southwest quarter of Section 20, Township 7 in Range 2 West, containing one acre more or less.
Trotter argued below that this was a void description, but on appeal he concedes that the Burgesses received something by this deed. There is not a definite 140-yard tract of land between the old and new roads, no matter how the tract is configured. Thus, this suit, this appeal, and this rehearing.
¶ 7. The Burgesses claim that the 140-yard dimension was intended to run north and south between the two roads. By making the northern boundary of the tract the same as the northern boundary of the NW % of the SW % and the southern boundary an old fence, a 1.33 acre tract results. However, according to a survey admitted into evidence, this would make the strip of land approximately 700 feet in length, 156 feet wide at the southern end and 45 feet wide at the northern. None of those dimensions are close to the 140 yards (420 feet) mentioned in the deed.
¶ 8. In addition to the deed with ambiguous language, the Burgesses also claim that they acquired this strip of land, plus all the land east of the old road bed, through continuous and exclusive use.
¶ 9. To the contrary, Trotter claims that the western boundary line of the east 2.5 acres was never thought to be at the old road bed. That would mean that the Burgess family has never had frontage on the road, old or new, nor until the 1941 deed even had formal right of access. If the Burgesses before 1941 had accessed the old road where it crossed through this forty acre tract, it had been only by the Trotter’s sufferance. Instead, Trotter claims that the 140-yard strip is basically a roadway that runs east from the new Bolton and Brownsville road to the Burgess property. Trotter argues that the strip is the present location of the Burgess driveway. The driveway, according to an aerial photograph introduced into evidence and as drawn onto our exhibit, extends easterly from the Bolton and Brownsville Road at a location about 100 feet south of the northern boundary of the NW % of the SW }4. Like the Burgess claim, the Trotter interpretation does not succeed in making the 1941 deed description fit with the survey information. It is not 140 yards from the new road to the edge of what Trotter claims is the western edge of the Burgess property, but less than 200 feet at the location of the present driveway.
¶ 10. The testimony was much in conflict. If the evidence at this trial was similar to that presented in the 1998 adverse possession suit, we understand why *766 the earlier chancellor found that neither party had exclusive possession. Trotter and several witnesses testified in the present litigation that they had hunted, mended fences and farmed on the property on the east side of the old road bed to the fence line just south of the Burgess driveway. The fence that creates a southern boundary for the Burgess homestead is roughly parallel to but 150 feet south of the driveway. Sarah Trotter (the plaintiffs mother) testified that she was present during the negotiations for the 140-yard strip of land and that the strip ran east to west to the existing Burgess driveway. In addition, a transcript from the 1998 suit was admitted into evidence. Trotter emphasizes this answer by Francis Burgess, Sr.:
Question: So the 140 yard strip was actually between the — in front of the old house, headed out toward the new road?
Answer: That would be correct.
¶ 11. As with many aspects of the case, there is ambiguity as to what this witness meant. The witness had just finished saying that his family already owned everything in the NW \ of SW 14 east of the old road. It would be inconsistent for him then to testify that his family needed a deed to anything east of the old road. He then said that “the 140 yards started from the south side of the driveway because the driveway between the old and the new road was considered a public road because it went east to people that lived back behind our place.” The previously quoted question and answer about the road being in front of the old house immediately followed this answer.
¶ 12. What Burgess meant by saying that the “140 yards” starts on the south side of the driveway between the old and new road is also confusing. The east-west distance between the old and new roads at that location was 100 feet or less. Burgess also did not say that the 140 yards started on the east side of the new road, but on the south side of the driveway. If the south side of the driveway is a boundary, that might just as logically mean that the tract went north or south from the driveway between the two roads for 140 yards.
¶ 13. Obviously, the confusion about the 140-yard tract is significantly affected by the uncertainties of whether the parties believed at the time of the 1941 deed that the Burgesses owned all property east of the old road. What land the Burgesses needed to be conveyed as a result of the movement of the road depends on what land they already owned.
¶ 14. The chancellor found that the parties owned the properties as stated in their deeds and as located by current surveys of the deed descriptions. Her initial opinion said “that title to the 140 yard strip shall be vested in H. Alex Trotter,” but then at the conclusion of the opinion held that the Burgess family owned “a strip beginning at the South edge of the Burgess driveway running East over to the Burgess property.” After requests for clarification, she added to the end of the just-quoted description of the tract: “which strip was conveyed by Warranty Deed,” and then gave the recording information for the 1941 deed of the 140-yard tract.
¶ 15. From this judgment, the Burgess-es appeal.
DISCUSSION

1. Location of 14-0-yard strip

¶ 16. The Burgess argument is that the chancellor’s effort to locate and then describe the 140-yard strip conveyed in 1941 leaves the property ambiguously situated. They also argue that the plain language of the 1941 deed has been ignored, and that a *767 tract smaller than the one acre mentioned in the deed has been confirmed in them.
¶ 17. Fact-findings made in a lower court must be reasonably supported by the record. If they are, then the findings will be upheld. How the judge applies those facts to resolving the legal issues presented by the case is a matter for de novo review on appeal. Lee Hawkins Realty, Inc. v. Moss, 724 So.2d 1116, 1118(¶ 8) (Miss.Ct.App.1998).
¶ 18. The initial problem with the chancellor’s ruling is that it does not describe an identifiable tract of land. The decree described the tract as “beginning at the South edge of the Burgess driveway”; this is a point of beginning only if we infer a beginning at the driveway’s intersection with the public road. The tract is then described as “running East over to the Burgess property.” We assume that this means to run east along the southern boundary of the driveway as it angles slightly north according to the aerial photograph. The “Burgess property” would be the property confirmed in the defendants in this suit,' which is the easternmost 2.5 acres in the NW \ of the SW %
¶ 19. Among other description defects, there is no indication of whether the southern boundary of the driveway is the northern or southern boundary of the tract. If it is the northern, then the tract whose title was confirmed in the Burgesses would not give them title to their own driveway. What is also unstated is the remaining boundary: how far north or south does the tract then go? Perhaps it is the driveway itself across Trotter land that is solely being confirmed in the Burgesses. Though requests for clarification caused a reference to the official recording of the 1941 deed to be added to the description, nothing appears in the deed to confirm the location of the tract. The deed mentions 140 yards and one acre, more or less. The 140 yards have always been a cause of and not the answer to ambiguity. The fact that the tract is to be approximately one acre could mean that the chancellor was saying that the property is a one acre tract with the driveway as either the north or south boundary, the new road as the western, and the Burgess property as the eastern. See Herod v. Robinson, 149 Miss. 354, 115 So. 40 (1927) (“140 acres in south part of section 31,” east of road and west of another tract, is valid description). We still would have the question of whether the tract is north or south of the driveway. We find any answer we give to be entirely speculative based on the manner in which the decree is written. Also, because of what we conclude about the evidence, we find other reasons to remand for further proceedings.
¶ 20. The issue of whether the 1941 deed contained a void description that conveyed no property at all was contested at trial. There was expert testimony that the deed description could not be platted due to its lack of starting and ending points. That is undoubtedly true. This issue is not a question on appeal, however. Trotter has affirmatively conceded that Burgess received title to some property in this deed, so the trial court must resolve what tract the 1941 parties intended to convey. Nothing we conclude here is a holding as to whether or not a description such as this is void.
¶ 21. To locate this tract, we look first at the deed: “A narrow strip of land, approximately 140 yards long, lying between the old and new Bolton and Brownsville Highway, and adjoining the land now owned by said A.L. Burgess.... ” Ignoring the 140 yards of undirected distance, the language suggests that the entire property is between the old and new locations of the road, and that by lying there, it also borders the Burgess property. Without giv *768 ing too much weight to the almost weightless, we conclude that the most natural reading of the deed language itself is consistent with the Burgess view that their family property historically bordered the old road. Trotter maintains that a substantial distance lay between the old road and the western edge of the Burgess property. If that was the premise for the deed, then added to the deed should be the bracketed language: “lying between the old and new Bolton and Brownsville Highway, and [then extending east across Trotter property in order to] adjoint ] the land now owned by said A.L. Burgess.... ” That would still leave unstated the north and south boundaries of the tract. This deed answers few concrete questions.
¶ 22. Since we find the natural reading of the actual language is to define a tract that lay totally between the two roads and was contiguous to land then owned by Burgess, we examine the effect of each party’s argument about the deed’s meaning to see if either falls within these parameters. The Burgesses presented a surveyor who prepared a plat of an area that was between the two roads. It is shown on our exhibit as parcel 3. It is strictly land between the two roads, has the northern boundary of the NW % of the SW ]4 as its northern boundary, and extends south to what the surveyor had found was an old fence. The Burgess position is that the fence indicates what the neighboring landowners long ago physically established as the tract that had been conveyed. This surveyor testified that between the date of his two 1997 surveys, the old fence had been torn down.
¶ 23. Two difficulties arise with this evidence. The first is size. The tract is 1.33 acres, not one acre. More outsized is the distance. It extends about 700 feet, not 420 feet. If either the northern or southern boundary of the platted tract is definitely what was intended by the 1941 deed, the other survey boundary may be different than what was intended to be conveyed.
¶ 24. The other problem is that under current surveys, the tract is not “adjoining the land [then] owned by said A.L. Burgess,” but is separated from that land by what the attached plat identifies as Parcel 2. That is why the Trotter’s argued and the chancellor accepted that the tract begins at the new road, crosses the old road, and then keeps on going. However, several witnesses suggested a long-time, different understanding than that reached by the surveyors in the late 1990’s, of the location of the east line of the NW % of SW ]4. Francis Burgess, Sr. testified that the 1927 deed of the eastern 2.5 acres in the quarter-quarter section had been intended to convey to the Burgess family the land between the old road and the eastern line of the NW ]4 of SW % since the Burgesses already owned the property further east. Burgess stated that the 1997 survey was the first time that he learned that the family’s deed descriptions did not extend to the east boundary of the old road.
¶ 25. There was further testimony on both sides of the issue of common error. An abstractor for a title insurance company examined the records on this property back to 1838. It was his opinion that the eastern 2.5 acres were conveyed in order to give the Burgess family the property between the old road and the east fine of the NW ]4 of SW \ Thus when the Burgess family got the eastern 2.5 acres in the NW ]4 of the SW % and also a similar tract to the south, it was his opinion that they were thought to be getting the land between their existing property and the road.
¶ 26. W.C. Alderman, the surveyor whom the Burgesses employed, testified that when he performed a survey in September 1997, there was an old fence along *769 the west line of parcel 2 as shown on our exhibit. That fence followed the depression left by the old Bolton and Brownsville roadbed, and was on the east side of where the road had been. That fence continued south of the property in dispute here. At the bottom of parcel 3, which is what the Burgesses have argued is the 140 yard tract, was another old fence that went west to the boundary of the present public road. This was a barbed wire fence in which a line of trees 24 to 30 inches thick had grown. The fence was in fairly good condition. From his experience, that fence would have been there at least 30 or 40 years. The surveyor also noted a fence at the midpoint of parcel 3 as shown on our exhibit. That seemed of equal vintage and condition. To the north and east of the latter fence was the Burgess home. It was the Burgess position that these fences marked boundaries for their long-time property.
¶ 27. The surveyor went back to the property in November 1997. The fence along the western side of parcel two had been destroyed, and the iron pins had been removed. Then the surveyor testified about a second fence, apparently meaning the one that formed the southern boundary of parcel 3, and it too had been removed and the iron pins pushed over and destroyed.
¶ 28. Trotter’s witnesses testified that their family had never thought that the Burgess property reached the old road. Trotter was asked repeatedly about the point and denied any misconception. When Trotter was asked about the destruction of fences, an objection was sustained.
¶ 29. The chancellor’s findings did not address the matter of a potential mutual mistake at the time of the old deeds about the location of the east line of the quarter-quarter section. Neither is there discussion of what is fairly credible evidence that there were long-time fences. Instead, by relying on the survey platting of the deed descriptions, she found that Trotter owned everything except the east 2.5 acres in the disputed property, and the 140-yard strip. She also found consistently with what the earlier litigation had determined, that the Burgesses did not have the kind of significant and exclusive possession necessary to wrest ownership away from the record title owner.
¶ 30. As to the 140 yard strip, the chancellor concluded that the strip of land could not just be between the two roads but had to go farther east to join the property then owned by A.L. Burgess. According to the language of the deed, the strip was between the roads but also had to join the property then owned by A.L. Burgess. Since there was no consideration of the principle of a mistaken and correctable description in the deeds, the possibility that the A.L. Burgess property did actually join the old road was not analyzed. In fact, we find that a quite credible interpretation of all the evidence, especially the conveyance in 1927 of a total of 5 acres, half in the forty acre tract involved in this suit and the other half to the south, was that the Burgess family was to receive the land between their eastern property and the old road. No other plausible explanation for the 1927 conveyance of a pinched half mile tract appears in the current record. Perhaps there is one, though.
¶ 31. No definite description of the 140-yard strip has yet been made. We also find that the failure to make findings on the mutual mistake concept leaves us unable to conclude that the factual validity of the concept was accepted or rejected before deciding where the property covered by the 1941 deed was located. It is true that the Burgesses never asked for refor *770 mation as to the deeds involving the east 2.5 acres, but we do not find that important in the fact-finding as to the 140-yard tract. The relief of reformation is not needed in order to use the concept of mistake when interpreting what this different deed was intended to accomplish.
¶ 32. We find that insofar as the 140-yard tract is concerned, the evidence of mistake on the understood location of the Burgess property’s western boundary was central to determining what the 1941 deed was intended to do. If the Burgess property was contiguous to the old road, then when the new road was shifted west and given more curvature, only on the north did the new road curve relatively close to the Burgess property. That is where the Burgesses now argue they received property lying totally between the two roads and adjoining their land. We reverse as to this tract so that the credibility and weight of the evidence about mistake can be determined.
¶ 33. As to the principle of reformation, we note that a deed description that arises from a mutual mistake of the parties may be corrected. That a mistake existed must be proved beyond a reasonable doubt. McCoy v. McCoy, 611 So.2d 957, 961 (Miss.1992). There was substantial circumstantial evidence and also physical fences. Whether these proved a mutual mistake was for the chancellor to decide. If so, then a deed may be corrected to reflect what the parties intended at the time. “Adverse” possession by the grantee is not thereafter needed. To maintain title, the grantee simply must not have permitted someone else to use the property adversely. We do not enter the intricacies of Mississippi Civil Procedure Rule 8(a) on whether the counter-claim made a sufficient statement about reformation of deeds. The Burgesses sought to have title quieted in them based both on record title and on adverse possession. The only manner in which the deeds could have supported record title was by reformation. The initial relief of deed reformation likely should have been requested. Still, the matter was tried by consent when both parties addressed at considerable length whether there was an historical error. Since we are reversing on the 140-yard strip, the same uncertainty about whether the chancellor considered all the legal issues raised by the evidence causes us to reverse on the remaining contested property. Any pleading requisites can then be dealt with.

II. Expert Witness

¶ 34. The Burgesses argue that the chancellor abused her discretion in relying on the testimony of Trotter’s expert over their own. We find this issue largely to be academic, as new proceedings on remand may change the mix of evidence and reliance.

III. The Burgess adverse possession claim

¶ 35. The Burgesses claim that the chancellor erred in denying their claim for adverse possession of the disputed property. For possession to be adverse, it must be (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful. Rice v. Pritchard, 611 So.2d 869, 871 (Miss.1992). The adverse possessor must establish by clear and convincing evidence that each element is met. Id.
¶ 36. The evidence of use was much in conflict, and even if we were to determine that it favored the Burgess family, and we do not indicate any opinion, the weight and credibility of evidence is largely for the trial level fact-finder. We can accept that *771 neither side presented sufficient evidence to prove that it had overcome the record title of the other. The res judicata effects of the 1998 suit, then, which did not confirm title in anyone but only dismissed the Burgess claim of adverse possession as not having been proven, need not be considered. We find the matter of adverse possession has been fully presented, and we affirm the determination that there was none.

IV. Trotter’s Deraignment of Title

¶37. The Burgesses argue that Trotter failed properly to deraign his title since he did not list three deeds which conveyed away some of the property in the NW 54 of the SW 54.
¶ 38. In order to have clouds removed from a chain of title, the claimant must establish perfect title in himself. Culbertson v. Dixie Oil Co., 467 So.2d 952, 954 (Miss.1985). Trotter deraigned title beginning with the 1834 patent, then picking up title again in 1905. Initially, Trotter was claiming the east 2.5 acres of the land involved. Among the omitted deeds were those conveying away that property. There was a description error in some of the deeds to the 2.5 acre tract, which formed the basis for the argument that the Burgesses did not own any property at all in the NW 54 of the SW 54. The deed of conveyance of the 140-yard tract was also omitted. Both were mentioned in the complaint, though, as deeds whose removal as clouds was being sought.
¶ 39. We find compliance with the obligation to deraign title, and no interference with the truth-seeking function of the trial court.

V. Refusal to allow impeachment of witness

¶ 40. The Burgesses argue that the chancellor erred in refusing to allow Trotter to be impeached by use of testimony in the 1998 litigation. During cross-examination, the Burgess counsel began to ask Trotter about a fence. Counsel was apparently seeking confirmation that Trotter had removed it. This is part of the same fence that formerly had been on the eastern boundary of the old roadbed and according to surveyor Alderman, had been removed between September and November 1997.
¶ 41. An objection was made as to the relevancy of the issue. The chancellor determined that the land at that location was not involved in the present litigation. No proffer was made of what the response might have been. Murray v. Payne, 437 So.2d 47, 55 (Miss.1983). There at least was evidence already before the court that a fence formerly marking the boundary of parcel 2 along the old road bed had been removed. If the issue of a fence, its purpose, origins, and removal, resurfaces during new proceedings, this impeachment can be reconsidered.

VI.Denial of Restraining Order and Supersedeas.

¶ 42. The Burgesses sought a restraining order and a stay of judgment pending an appeal. That was denied. Since we are reversing, supersedeas for the Bur-gesses is now academic.

Conclusion

¶ 43. We reverse and remand for reconsideration of the 140 yard strip because it has not yet been definitely located. We also reverse and remand the determination of the ownership of parcel 2 on our exhibit, which is the land between the old road and the eastern 2.5 acres of the NW 54 of SW 54, for reconsideration in light of this opinion. Finally, we hold that the issue of adverse possession by the Burgess family of any of the disputed land has been finally adjudi *772 cated against them. The chancellor may conduct such additional evidentiary or other proceedings as appear appropriate.
¶ 44. THE JUDGMENT OF THE CHANCERY COURT OF THE SECOND JUDICIAL DISTRICT OF HINDS COUNTY IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, AND CHANDLER, JJ„ CONCUR. GRIFFIS, J., NOT PARTICIPATING.
*773 [[Image here]]

. This opinion replaces the Court’s former opinion. The motion for rehearing is granted.